# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| United States of America,<br><br>Plaintiff,<br><br>v.<br><br>Rodrigo Hernandez-Guevara (2),<br><br>Defendant. | Case No. 18-cr-299(2) (SRN/BRT)<br><br>**ORDER** |

Thomas M. Hollenhorst, United States Attorney's Office, 600 U.S. Courthouse, 300 S. 4th St., Minneapolis, MN 55415, for the Government

Ryan Else, Brockton D. Hunter, PA, 3201 Hennepin Ave. S., Minneapolis, MN 55408, for Defendant

SUSAN RICHARD NELSON, United States District Judge

This matter is before the Court on Defendant Rodrigo Hernandez-Guevara's Motion for Temporary Release to Home Detention ("Motion for Release") [Doc. No. 182]. The Government filed a response in opposition to the Motion for Release. (Gov't's Opp'n [Doc. No. 188].) Based on a review of the file, record, and proceedings herein, and for the following reasons, the Court denies the Motion for Release.

I.   **BACKGROUND**

A.  **Procedural and Factual Background**

On December 12, 2018, the Government charged Hernandez-Guevara and two codefendants with conspiracy to distribute methamphetamine, two counts of distribution of methamphetamine, and one count of possession with intent to distribute methamphetamine. (Indictment [Doc. No. 24], Counts 1–4.) After his arrest and preliminary detention, (*see* Nov. 16, 2018 Minutes [Doc. No. 11]; Order of Prelim. Detention [Doc. No. 12]), Magistrate Judge Katherine Menendez ordered him to be detained. (Nov. 19, 2018 Minutes [Doc. No. 16]; Order of Detention [Doc. No. 19].) In the Order of Detention, the magistrate judge noted that Hernandez-Guevara was an illegal alien, had waived the detention hearing, and had presented no evidence to rebut the applicable presumption of detention that no condition or combination of conditions would reasonably ensure his appearance in court and the safety of the community. (Order of Detention at 1–2.)

In November 2019, pursuant to a plea agreement, (the "Plea Agreement"), Defendant pleaded guilty to the conspiracy charge in Count 1 of the Indictment. (Nov. 4, 2019 Minutes [Doc. No. 159].) In the Plea Agreement, Hernandez-Guevara also admitted that in September and October 2018, he was involved in three separate methamphetamine transactions with his codefendants. (Plea Agmt. [Doc. No. 160] ¶ 2.) The Plea Agreement further notes the parties' agreement that Count 1 carries a statutory maximum sentence of life in prison. (*Id.* ¶ 4.) In addition, Hernandez-Guevara recognized that due to his

immigration status, because he was pleading guilty to a serious drug trafficking offense, his removal from the United States was presumptively mandatory. (*Id.* ¶ 7.)

In the Presentence Investigation Report, ("PSR"), U.S. Probation and Pretrial Services calculated a total offense level of 32, with a criminal history category of 1, resulting in a Guidelines range of 121 to 151 months. (PSR [Doc. No. 71] ¶¶ 28, 33, 57.)

### B. Parties' Arguments and Evidence

Hernandez-Guevara remains in detention in the Sherburne County Jail ("the Jail"). Given the COVID-19 pandemic, he seeks release pending sentencing. (Def.'s Mot. at 1.) Hernandez-Guevara argues that the Mandatory Detention Act is inapplicable to his case because he is "safety-valve" eligible. (*Id.* at 1–2; 5–6) (citing 18 U.S.C. § 3553(f)(1)–(5)). He contends that he poses no risk of flight, and conditions of release are available that will allow him to avoid the risk of harm associated with COVID-19 while also ameliorating any danger to the community. (*Id.* at 5–7.) He asks that the Court permit him to be released to home confinement. (*Id.*)

The Government opposes Defendant's motion. (Gov't's Opp'n at 1.) It argues that the Mandatory Detention Act applies, as Defendant pleaded guilty to a Controlled Substance Act offense that carries a maximum term of life imprisonment. (*Id.* at 7–8, n.1.) In addition, the Government contends that under 18 U.S.C. § 3145(c), Hernandez-Guevara cannot carry the burden necessary for release by establishing: (1) the existence of "exceptional reasons" for which his continued detention would be inappropriate; and (2) that is unlikely to flee and does not pose a risk of danger. (*Id.* at 8.) The Government asserts that the mere fact of being in custody during a pandemic is not an "exceptional

reason," warranting release, and, in fact, Defendant is the beneficiary of the "extraordinary steps" the Jail has taken "to avoid or mitigate the virus's spread." (*Id.* at 11.)

In response to Defendant's concerns about COVID-19 and the safety of conditions in the Jail, the Government submits the Affidavit of Brian Frank, dated April 17, 2020 (the "Apr. 17 Frank Aff." [Doc. No. 188-1]). Mr. Frank is the Jail Administrator of the Sherburne County Jail, and supervises the operations of the facility. (Apr. 17 Frank Aff. ¶ 1.) In his affidavit, Frank details the general background, structural safety, operational safety, and medical safety of the Jail, as well as the efforts taken to facilitate inmates' ability to consult with counsel. Frank notes that at present, there are no known cases of COVID-19 in the Jail. (*Id.* ¶ 4.) In response to inmates' concerns about the pandemic, on April 1 and 2, 2020, Frank listened to their concerns, and told them about the additional safety measures the Jail has implemented and continues to review as a result of COVID-19. (*Id.*)

Frank reports that one of the first responsive measures undertaken by the Jail was to reduce the inmate population. (*Id.* ¶¶ 7–8.) Jail administrative staff are working with federal agencies, including ICE and the U.S. Marshal's Service, to limit the number of detainees and inmates. (*Id.*) On March 16, 2020, the total Jail population (including ICE detainees and inmates) was 606. (*Id.* ¶ 8.) As of April 10, 2020, the total Jail population was down to 450. (*Id.*)

Also, the Jail has implemented additional procedures to monitor the health of incoming inmates before housing them in the general population. (*Id.* ¶ 9.) Upon booking, new arrivals are medically screened, which includes the completion of a Coronavirus

Screening Checklist.  (*Id.* ¶ 10 & Ex. 1 (Coronavirus Checklist).)  New inmates are then placed in an individual quarantine cell for a 14-day period.  (*Id.* ¶ 10.)  The Jail has designated 24 quarantine cells for new arrivals.  (*Id.*)  While the newly arriving inmates are in quarantine, licensed medical professionals monitor their health for signs or symptoms of illness.  (*Id.*)  If an inmate displays any signs or symptoms of illness, they are seen by a licensed medical professional and treated accordingly.  (*Id.*)

In addition to the Coronavirus Screening Checklist, as part of the screening process, the Jail's medical clinic is able to test inmates for Influenza A and B and for strep throat.  (*Id.* ¶ 11.)  Any new or existing inmate who tests positive for these illnesses is placed in a medical isolation cell, if directed by medical staff.  (*Id.*)  The Jail also has three negative pressure cells that may be used, in which the air is mechanically ventilated to general negative pressure to prevent contaminated air from escaping.  (*Id.* ¶ 13.)

While the Jail itself lacks the ability to test for COVID-19, if an inmate shows symptoms of the virus, and influenza and strep have been eliminated, Jail administration defers to medical staff regarding whether the inmate should be transported to a hospital or clinic for additional testing.  (*Id.* ¶ 12.)  If testing is unavailable, the Jail will place the inmate in medical isolation or other housing, as directed by medical staff.  (*Id.*)  As of April 17, 2020, only one inmate has been sent for testing, with negative test results.  (*Id.*)  If an inmate is transported for testing and is awaiting test results, the Jail will place the inmate in medical isolation and consult with Jail medical staff and the Minnesota Department of Health ("MDH").  (*Id.* ¶ 14.)

In terms of the Jail's structural safety, Frank states that if necessary, the Jail can isolate into 12 distinct sectors or "smoke zones." (*Id.* ¶ 17.) To do so, the Jail's nine separate air exchange units can be calibrated to bring in a certain percentage of fresh air, while exhausting the same amount of air from inside the Jail. (*Id.*) The return air passes through a MERV-8 filter before entering the Jail. (*Id.*) Within a given zone, this ventilation system is able to recycle up to 100% of the air with fresh air, unless cold weather conditions do not permit an exchange at that level. (*Id.*) The Jail can control the percentage variable, which is typically set at approximately 20%. (*Id.*) In light of COVID-19 safety measures, the Jail has adjusted the value for all zones to 80%. (*Id.*) The Jail continues to monitor the air exchange settings in all zones and will adjust them as necessary, and to the extent feasible under existing conditions. (*Id.*)

As to operational safety, Frank states that the Jail receives regular updates from state and federal agencies and responds accordingly, given the unique environment of a correctional facility. (*Id.* ¶ 5.) The Jail participates in teleconferences hosted by the Minnesota Department of Corrections ("DOC"), where the participants discuss best practices to ensure inmate and staff safety. (*Id.*) Jail administration believes that the measures and procedures it has put in place meet or exceed those of other correctional facilities in Minnesota. (*Id.* ¶ 6.) In response to an inmate complaint, on April 10, 2020, the Inspection and Enforcement Unit of the Minnesota DOC recently reviewed the Jail's increased safety measures and procedures. (*Id.*) The inspector concluded that "[t]he steps taken by Sherburne County Jail Administration exceed the prevention measures being taken in correctional facilities across the state and do not violate any Rule provision." (*Id.*)

6

Frank also reports that the Jail "has increased its rigorous cleaning, sanitation, and hygiene procedures." (*Id.* ¶ 18.) The Jail cleans all frequently-touched surfaces in housing units four times daily with a virus-killing chemical, and additionally cleans housing units before every meal and the nightly lockdown. (*Id.*) Hallways are cleaned and disinfected three times daily and floors are cleaned once a day. (*Id.*) Soap and water are available to inmates and staff, all of whom are encouraged to wash hands regularly. (*Id.*) In addition, the Jail has retained a contractor to assist in sanitizing touchpoints in the Jail, including housing units. (*Id.* ¶ 19.) The contractor began on April 7, 2020 and will work three times per week. (*Id.*)

With respect to social distancing measures and handwashing standards, the Jail has adopted the following procedures: (1) reducing the number of inmates allowed out of their cells at any given time to half of the population; (2) inmates rotate where they will eat on alternate days, with half of the population eating in their cells, and the other half eating in the dayroom, and inmates are responsible for picking up and returning their own meal trays to eliminate interactions with corrections officers; (3) reducing the number of hours that inmates may be outside of their cells; and (4) posting signs in all housing units with guidance on proper handwashing procedures. (*Id.* ¶ 20.) All of these measures have been undertaken to minimize contact between staff and inmates. (*Id.* ¶ 21.) Jail staff have also consulted with the MDH about social distancing strategies and have followed the agency's recommendation to adopt a conservative approach regarding inmate movement and in-person contact. (*Id.*)

The Jail has also modified delivery systems within housing units to reduce unnecessary person-to-person contact. (*Id.* ¶ 23.) The Jail now utilizes the following procedures: (1) inmates may receive commissary deliveries, but only to individual cells after evening lockdown; (2) inmates may access their legal carts when they are otherwise allowed to be outside their cells; (3) medication delivery for non-dormitory housing units is done in the main hallway of a unit, using a pass-through door, and medical staff who dispense medication have been required to wear a mask and a face shield or goggles since April 5, 2020; and (4) the exchange of clothing is similarly conducted through a pass-through door. (*Id.*)

As to the Jail's staff, Frank states the following procedures have been enacted to limit the chances of contamination or cross-contamination: (1) as of April 6, 2020, Jail staff work 12-hour shifts with seven days on, and seven days off, during which time they may self-quarantine and monitor for any signs of illness; (2) all Jail staff are screened with a body-temperature check and the Coronavirus Screening Checklist every time they arrive at work; (3) the Jail provides electronic briefings to staff at the beginning of shifts, as opposed to face-to-face briefings; (4) during an entire seven-day work period, Jail staff are assigned to only one of three work zones, having a separate entry point for each zone, with the exception of "rovers," or if the need arises to enter a different zone in the event of an emergency; (5) as of April 4–5, 2020, Jail staff are following updated CDC guidelines to wear masks while inmates are out of their cells, and staff are attempting to augment their supply of surgical and N95 masks; and (6) as of April 6, 2020, the Jail received a supply of cotton-style barrier masks, and again, based on guidance from the Minnesota DOC and

MDH, staff were instructed to wear the masks when inmates are out of their cells. (*Id.* ¶ 24)

In addition, regarding the ability of inmates to consult with defense counsel, Frank states that while concerns about COVID-19 have caused the Jail to temporarily discontinue direct contact visits, inmates retain the ability to consult with defense counsel. (*Id.* ¶ 25.) All inmates and counsel may use video visitation in the common areas of the housing unit. (*Id.*) In addition, when approved by the Court, the Jail also facilitates video teleconferencing for inmates to appear for court appearances. (*Id.* ¶ 26.) The Jail also is committed to facilitating interactions between inmates and defense counsel before, during, and after court appearances. (*Id.*).

## II. DISCUSSION

### A. Motion for Release

The release of a defendant pending sentencing is proscribed by 18 U.S.C. § 3143. Under § 3143, where a defendant has been found guilty of certain serious drug trafficking offenses or violent crimes described in § 3142, the judicial officer "shall order" the person detained, unless the judicial officer finds: (1) "by clear and convincing evidence that the person is not likely to flee or pose a danger to the safety of any other person or the community" if released; and (2) there is a substantial likelihood that a motion for acquittal or a new trial will be granted, or counsel for the Government has recommended that no sentence of imprisonment be imposed. 18 U.S.C. § 3143(a)(2). If these standards are unmet, a defendant may appeal a detention order by showing that "there are exceptional reasons why [his] detention would not be appropriate." 18 U.S.C. § 3145(c). In addition

9

to showing exceptional reasons, the defendant must still establish by clear and convincing evidence that he is not likely to flee or pose a danger to the community. *Id.*; *see also United States v. Morris,* No. 17-cr-107(01) (DWF/TNL), 2020 WL 1471683, at *1 (D. Minn. Mar. 26, 2020)

As applied here, Hernandez-Guevara has pleaded guilty to a serious drug trafficking offense that falls within the statutory provision for mandatory detention, despite his argument that he is not subject to a ten-year mandatory minimum term of imprisonment. Hernandez-Guevara pleaded guilty to a Controlled Substance Act offense that carries a statutory maximum term of life imprisonment. S*ee* 21 U.S.C. § 841(b)(1)(A). Accordingly, his offense qualifies for mandatory detention. *See* 18 U.S.C. §§ 3142(f)(1)(C) & 3143(a)(2) (stating that mandatory detention applies to "an offense for which a maximum term of imprisonment of ten years or more is prescribed in the Controlled Substances Act . . . .").

Given Hernandez-Guevara's guilty plea, there is not a substantial likelihood that a motion for acquittal or a new trial will be granted, s*ee* 18 U.S.C. § 3143(a)(2), nor does the Government advocate for the imposition of no sentence. (*Id.*) Accordingly, the Court considers whether Defendant has shown that: (1) an "exceptional reason" makes his continued detention no longer appropriate; and (2) he is unlikely to flee and does not pose a danger to the community. 18 U.S.C. § 3145(c).

While the Court is sympathetic to Defendant's concerns about the possibility of contracting COVID-19, such concerns are not the only determinant of whether detention is appropriate. *See United States v. Jones*, No. 1:17-cr-00582-CCb-2, 2020 WL 1323109,

at *1 (D. Md. Mar. 20, 2020) (denying motion for release of detainee exposed to COVID-19 at another detention facility, despite detainee's underlying health issues including pregnancy, because such considerations were not the sole determinant of whether detention was appropriate under § 3142(g) factors). In fact, the pandemic has no impact on the question of whether Defendant poses a flight risk or is a danger to the community.

In November 2018, the magistrate judge applied the factors of § 3142(g), the presumption of detention, and considered Defendant's waiver of the detention hearing, and found that no conditions or combination of conditions would assure Defendant's appearance at future court proceedings. (Order of Detention at 2.) Hernandez-Guevara offers no explanation for how his concerns about contracting COVID-19 impact this prior determination.

Nor does Defendant's concern about the pandemic constitute an exceptional reason warranting release under § 3145(c). Defendant's concern is generalized and speculative in nature, as he cites general studies and articles about the risk of infection in jails and prisons, and the overall health of incarcerated people. *See United States v. Winchester*, No. 18-cr-301(1), 2020 WL 1515683, at *5 (M.D.N.C. Mar. 30, 2020) (denying request for release in wake of COVID-19 pandemic, and finding that the defendant failed to address the circumstances at the facility in which he was detained, and instead extrapolated "from far-flung situations in the broadest of broad-brush strokes[.]").

To the extent that Hernandez-Guevara speculates about inmates "cycl[ing] in and out of Sherburne County Jail from all over the state," and staff who "leave and return daily, without screening," (Def.'s Mot. at 3), his concerns are rebutted by the Frank Affidavit.

As set forth in the Frank Affidavit, the Jail has provided detailed information about the significant steps it has undertaken to prevent and mitigate the risks posed by COVID-19 to inmates' health and safety. As noted, the Jail quarantines and monitors incoming inmates for a 14-day period, and provides screening and medical care to any current inmates who exhibit signs or symptoms of illness. Moreover, the Jail has implemented procedures to limit staff time and work space in the facility, limit staff-inmate contact, and is monitoring the health of staff. In addition, the physical structure and airflow arrangements of the Jail are designed to protect inmates, and have been enhanced to provide even greater measures of protection.

As of this writing, all of these steps appear to be working, as there have been no reported incidents of COVID-19 within the Sherburne County Jail. *See United States v. Blegen*, No. 19-cr-304 (SRN/TNL), 2020 WL 1619282, at *5 (D. Minn. April 2, 2020) (noting absence of reported cases in Sherburne County Jail); *Morris*, 2020 WL 1471683, at *4 (noting, as of March 26, 2020, "zero reported cases of COVID-19 in the jail."); *see also United States v. Pate*, No. 8:17-cr-00236-PWG-1, 2020 WL 1694368, at *3 (D. Md. April 7, 2020) (noting that the detention facility had enacted comprehensive measures to avoid an outbreak and combat the virus); *United States v. Hamilton*, No. 19-cr-54-01 (NGG), 2020 WL 1323036, at *2 (E.D.N.Y. Mar. 20, 2020) (stating, "perhaps most importantly, as of this writing, there have been no reported incidents of COVID-19 within [defendant's detention facility], and the Bureau of Prisons is taking system-wide precautions to mitigate the possibility of infection within its facilities. As such, given the risks that [defendant's] release would pose, the court concludes that the possibility of an

outbreak at [his detention facility] is not a 'compelling circumstance' justifying his release."). In fact, Hernandez-Guevara might be at greater risk of contracting the virus if he were released to home detention.

Furthermore, Hernandez-Guevara does not represent that he has a medical condition that places him at greater risk with respect to COVID-19 than the rest of the population. *See United States v. Sanders*, No. 19-20037-01-DDC, 2020 WL 1528621, at *4 (D. Kan. Mar. 31, 2020) (noting that the defendant has no elevated personal risk factors for COVID-19, and may actually be at greater risk outside the prison). The risk created by the pandemic is not unique to Defendant, and exists in society at large. *See, e.g., United States v. West*, No. 20-MJ-5073 TLF, 2020 WL 1550624, at *3 (W.D. Wash. Apr. 1, 2020) (noting that risk of exposure to COVID-19 applies to "any person in our community at this time"); *United States v. Kerr*, No. 18-cr-296-L, 2020 WL 1529180, at *3 (N.D. Tex. Mar. 31, 2020) (stating that fear of COVID-19 outbreak is not unique to the defendant in particular, and is not an "exceptional circumstance."); *United States v. Cornish*, No. 20-cr-3-GFVT-MAS, ___ F. Supp. 3d ___, 2020 WL 1498841, at *5 (E.D. Ky. Mar. 30, 2020) (finding that because COVID-19 is prevalent in the community at large, any difference in health risks to detained population was minimal); *United States v. Jackson*, No. 18-cr-216, 2020 WL 1445958, at *2 (W.D. Pa. Mar. 24, 2020) (finding it speculative to presume that COVID-19 was present or imminent in jail, and noting that potential exposure exists anywhere in the wider community).

In sum, Defendant's concerns concerning COVID-19 do not constitute an "exceptional reason" under § 3145(c) to justify his release from the Sherburne County Jail.

*See Blegen*, No. 19-cr-304 (SRN/TNL), (D. Minn. April 2, 2020 Order at 9–11) (finding COVID-19 pandemic did not create exceptional reason for release from Sherburne County Jail); *Morris*, 2020 WL 1471683, at \*4 (finding, as to a defendant housed in the Sherburne County Jail who cited age and poor health, that COVID-19 pandemic did not constitute an exceptional reason for release); *United States v. Quijada*, No. 19-cr-276 (DSD/TNL), (D. Minn. Mar. 20, 2020 [Doc. No. 32]) (finding COVID-19 pandemic was not an exceptional reason warranting release from Sherburne County Jail).

### III. CONCLUSION

Accordingly, **IT IS HEREBY ORDERED** that:

**1.** Defendant's Motion for Temporary Release to Home Detention [Doc. No. 182] is **DENIED**.

Dated: April 23, 2020

                                                   s/Susan Richard Nelson
                                                   SUSAN RICHARD NELSON
                                                   United States District Judge